No.  23-1014

=========================================================

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee,*

v.

**ADAM FOX,**
*Defendant/Appellant.*

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

_____

**APPELLANT ADAM FOX'S BRIEF**

_____

=========================================================

Steven S. Nolder (0037795)
65 East State Street, Suite 200
Columbus, Ohio 43215
(614) 221-9790
snolder9@gmail.com
Attorney for Appellant Adam Fox

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ....................................................................... i-ii

TABLE OF AUTHORITIES ............................................................. iii-iv

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT ABOUT ORAL ARGUMENT ............................................ 1

STATEMENT OF THE ISSUES ........................................................... 1-2

STATEMENT OF THE CASE  ............................................................. 2-3

STATEMENT OF FACTS  ................................................................. 3-39

SUMMARY OF THE ARGUMENT .................................................. 40-41

ARGUMENT .................................................................................. 41-64

    **I.**    **THE DISTRICT COURT ABUSED ITS DISCRETION BY DEPRIVING FOX OF A "CONSTITUTIONALLY MEANINGFUL" *REMMER* HEARING.**
    ............................................................................... 41-46

    **II.**    **THE DISTRICT COURT ABRIDGED FOX'S RIGHT OF CONFRONTATION BY ARBITRARILY RESTRICTING FOX'S CROSS-EXAMINATION OF KALEB FRANKS.**
    ............................................................................... 46-54

    **III.**    **THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT FOX'S CONVICTIONS.**
    ............................................................................... 54-61

**TABLE OF CONTENTS**
(continued)

**Page**

**IV.    FOX WAS DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE WHEN THE DISTRICT COURT RULED THE INFORMANTS' COMMUNICATIONS TO THEIR HANDLERS WERE NOT PARTY-OPPONENT ADMISSIONS UNDER FED. R. EVID. 801(d)(2)(D).** ............................................................................. 61-64

CONCLUSION ............................................. 64

CERTIFICATE OF COMPLIANCE ....................................... 65

CERTIFICATE OF SERVICE .............................................. 65

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ....................................................... 66-68

# TABLE OF AUTHORITIES

## Cases

*Delaware v. Fensterer,* 474 U.S. 15 (1985) ............................................... 47

*Gooch v. United States*, 297 U.S. 124 (1936). ........................................ 59

*Jackson v. Virginia*, 443 U.S. 307 (1979) ............................................... 54

*Remmer v. United States*, 347 U.S. 227 (1954) ........ 1, 4, 40-42, 44-46, 64

*Dorsey v. Parke*, 872 F.2d 163 (6th Cir. 1989). ...................................... 46

*In re Sittenfeld,* 49 F.4th 2022 (6th Cir. 2022). ................................ 41, 42

*McPherson v. Woods*, 506 Fed. App'x 379 (6th Cir. 2012). .................. 48

*United States v. Branham*, 97 F.3d 835 (6th Cir. 1996). ................. 62, 63

*United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972). .................... 50

*United States v. Garrett*, 542 F.2d 23 (6th Cir. 1976). ......................... 47

*United States v. Guadarrama*, 591 Fed. App'x 347 (6th Cir. 2014). ................................................................................................ 54

*United States v. Harrison*, 663 Fed. App'x 460 (6th Cir. 2016). ................................................................................................ 55

*United States v. Kerns*, 9 F.4th 342 (6th Cir. 2021). ........................... 59

*United States v. Lang*, 717 Fed. App'x 523 (6th Cir. 2017). ................ 55

*United States v. Lanier*, 870 F.3d 546 (6th Cir. 2017) .......................... 41

*United States v. Lanier*, 988 F.3d 284 (6th Cir. 2021) .............. 41, 42, 45

*United States v. Martin*, 920 F.2d 393 (6th Cir. 1991). ....................... 47

*United States v. Rodriguez-Landa*, 2019 WL 1755518 (C.D. Cal. April 19, 2019). ........................................................................... 62

*United States v. Safehouse*, 985 F.3d 225 (3rd Cir. 2021). .................. 60

*United States v. Shaver*, 89 Fed. App'x 529 (6th Cir. 2004). ............... 47

*United States v. Small*, 988 F.3d 241 (6th Cir. 2021) ........................... 58

*United States v. Soto*, 794 F.3d 635 (6th Cir. 2015). ........................... 59

# TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Stafford*, 136 F.3d 1109 (7th Cir. 1998). ..................... 44

*United States v. Thompson*, 501 Fed. App'x 347 (6th Cir. 2012).. ................................................................................................ 61

*United States v. Reaves*, 636 F. Supp. 1575 (E.D. Ky. 1986)..... 11, 50-52,

## Statutes, Rules and Guideline Provisions

18 U.S.C. § 3231 .................................................................................... 1

28 U.S.C. § 1291 .................................................................................... 1

Fed. R. App. P. 32(a)(7)(B) ................................................................ 65

Fed. R. App. P. 34 ................................................................................. 1

Fed. R. Crim. P. 29 ....................................................................... 17, 54

Fed. R. Evid. 801(d)(2)(D) ........................................... 2, 37-39, 41, 61-64

Sixth Circuit Local Rule 30................................................................ 66

Sixth Circuit Local Rule 34................................................................. 1

## Constitutional Provisions

Sixth Amendment ..................................................................... 41, 46, 54

## JURISDICTIONAL STATEMENT

This is a direct appeal from the United States District Court for the Western District of Michigan.  Jurisdiction in that court was found in 18 U.S.C. § 3231, the district court's judgment was a final order (R. #801, Judgment), and a timely notice of appeal was filed. (R. #806, Notice of Appeal). Title 28 U.S.C. § 1291 gives this Court jurisdiction to hear direct appeals in criminal cases.

## STATEMENT ABOUT ORAL ARGUMENT

Because of the complexity of the issues presented and the size of the record, the decisional process would be significantly aided by oral argument.  Sixth Circuit Local Rule 34(a)(1) and FRAP 34.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.   **THE DISTRICT COURT ABUSED ITS DISCRETION BY DEPRIVING FOX OF A "CONSTITUTIONALLY MEANINGFUL" *REMMER* HEARING.**

II.  **THE DISTRICT COURT ABRIDGED FOX'S RIGHT OF CONFRONTATION BY ARBITRARILY RESTRICTING FOX'S CROSS-EXAMINATION OF KALEB FRANKS.**

III. **THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT FOX'S CONVICTIONS.**

IV.  **FOX WAS DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE WHEN THE DISTRICT COURT RULED THE INFORMANTS' COMMUNICATIONS TO THEIR**

HANDLERS WERE NOT PARTY-OPPONENT ADMISSIONS UNDER FED. R. EVID. 801(d)(2)(D).

### STATEMENT OF THE CASE

On April 28, 2021, the federal grand jury in the Western District of Michigan returned a three-count superseding indictment against Adam Fox, Barry Croft, Jr., Kaleb Franks, Daniel Harris, and Brandon Caserta. Count one charged all five with conspiring to kidnap Michigan's Governor, Gretchen Whitmer. (R. #172, Superseding Indictment, PAGE ID #961-66). Count two charged Fox, Croft, and Harris with conspiring to use a weapon of mass destruction. (R. #172, Superseding Indictment, PAGE ID #967-68). Count three charged Croft and Harris with possessing an unregistered destructive device. (R. #172, Superseding Indictment, PAGE ID #969). Finally, count four charged Harris with possessing a short-barreled rifle. (R. #172, Superseding Indictment, PAGE ID #970).

Fox, Croft, Harris, and Caserta went to trial in March 2022. After deliberating five days, the jury acquitted Harris and Caserta but didn't reach a verdict in Fox's and Croft's cases. A little more than four months later their retrial commenced, which is the subject of this appeal.

At the retrial, the government called 17 witnesses while the defense called seven. The jury began deliberating on August 22, 2022, and the

following day, Fox and Croft were convicted of all counts. (R. #N/A, Jury Verdict, 08/23/22).

An amended presentence report set Fox's base offense level at 43 and his criminal history category at VI. (R. #786, Sealed Amended PSR, PAGE ID #10,387). After considering the guidelines and 18 U.S.C. § 3553(a) factors, the court imposed a 192-month prison sentence and five years of supervised release. (R. #851, Sentencing Hearing Transcript, PAGE ID #16,365-366). The court also levied a $200.00 special assessment and a $2,500.00 fine. (R. #851, Sentencing Hearing Transcript, PAGE ID #16,365-366).

The judgment memorializing this sentence was filed on December 27, 2022. (R. #801, Judgment). Two days later, a timely notice of appeal was filed. (R. #806, Notice of Appeal).

## STATEMENT OF FACTS

### I.   Introduction.

Because of the enormity of the district court record, this statement of facts is tailored to the briefed assignments of error.

### (a)    Failure to Afford Fox a *Remmer* Hearing.

Before the start of the second day of testimony, an *in-camera* hearing was convened to address alleged juror misconduct.  (R. #848, Sealed *in Camera* Transcript, PAGE ID #16307-311).  The proceeding began with the court noting that Croft's counsel reported information the previous night "that would be juror misconduct if true."  (R. #848, Sealed *in Camera* Transcript, PAGE ID #16307). Croft's lawyer then made a proffer of a phone call he received the previous evening.  (R. #848, Sealed *in Camera* Transcript, PAGE ID #16307-309).

Both Croft and Fox sought to *voir dire* the entire jury panel as well as the juror in seat six before testimony began that day, August 11th. (R. #848, Sealed *in Camera* Transcript, PAGE ID #16310-311). The trial court denied this request, stating it was in "investigation mode." (R. #848, Sealed *in Camera* Transcript, PAGE ID #16310).

After the second day of testimony was concluded, another *in-camera* conference convened. (R. #856, Sealed *in Camera* Transcript, PAGE ID #16542-553). At this proceeding the district court informed counsel the jury clerk interviewed the individual identified by Croft's counsel earlier that day. (R. #856, Sealed *in Camera* Transcript, PAGE ID #16548).

Because this transcript is sealed, the person reporting the misconduct to Croft's counsel will be referred to as "the caller."

This interview yielded the following information: (1) "the caller." was a co-worker of the juror but the juror didn't make any of the alleged statements to "the caller"; (2) during a break the juror told another work colleague that he was selected for jury service, the defendants were guilty, and he'd make sure those guys were going to hang. This unidentified co-worker related this information to "the caller"; and (3) the co-worker who related this information to "the caller." didn't want to be identified and "the caller" didn't want to be involved in the misconduct inquiry for fear of losing his job. (R. #856, Sealed *in Camera* Transcript, PAGE ID #16547-548).

The court informed counsel it would conduct an *ex parte* interview of the juror after the trial day concluded on August 12th. (R. #856, Sealed *in Camera* Transcript, PAGE ID #16548). The government didn't object to this proposal and Fox's attorney cryptically responded "I am willing to take it one step at a time." (R. #856, Sealed *in Camera* Transcript, PAGE ID #16549). Croft's attorney clearly informed the court the juror should be individually questioned, the entire panel should be questioned, and all

5

counsel should be present.  (R. #856, Sealed *In Camera* Transcript, PAGE ID #16549-550).  Fox's counsel later clarified his position and wanted to be present and question the juror, but that request, like Croft's, was denied. (R. #711, Restricted Access Order, PAGE ID #8982).

The court met with the juror in chambers on August 12th.  (R. #849, Sealed *in Camera* Transcript, PAGE ID #16313-319). The juror was informed it was a "private meeting" that was being transcribed and a copy might be provided to counsel. The juror was not placed under oath before answering the court's questions.

During the meeting, the juror informed the court he'd followed all admonitions, would continue to serve fairly and impartially, and denied expressing to anyone that Croft and Fox were guilty. (R. #849, Sealed *In Camera* Transcript, PAGE ID #16314-16). However, when asked if he said anything about the case when Croft and Fox were first arrested, the juror was not as absolute and replied "[N]ot to my knowledge." (R. #849, Sealed *in Camera* Transcript, PAGE ID #16317).

Two days after the *ex parte* meeting, the court filed an order supplementing the record. (R. #711, Restricted Access Order, PAGE ID #8979-8989). In the order, the court denied the defendants' objections to

the procedure used to interview the juror (R. #711, Restricted Access Order, PAGE ID #8984 & 8986) and noted its conclusion that the juror was not biased. (R. #711, Restricted Access Order, PAGE ID #8987).

The juror suspected of being biased became the foreman of Fox's jury. (R. #847, Transcript Vol. XI, PAGE ID #16,295).

### (b) "Bertelsman Rule's" Impact on Kaleb Franks' Cross-Examination.

The first trial of this case was a twenty-day affair where 36 witnesses testified, and more than 500 exhibits were admitted. After closing arguments in the first trial, the court *sua sponte* notified the parties that it imposed time limits to present evidence in civil cases. (R. #830, Transcript Vol. XV, PAGE ID #14,003). The court also notified counsel that it had never imposed time limits in criminal cases despite being tempted. (R. #828, Transcript Vol. XV, PAGE ID #14,003).

At the final pretrial conference for the retrial, the court notified the parties to "plan your case assuming the same basic ground rules that I said in the first round." (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,712). The government estimated its case-in-chief would take two weeks and require 21 witnesses. (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,746). The number of witnesses could be reduced

by one-third if the defense didn't make chain of custody an issue for evidence seized at different locations. (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,746). The government also estimated the number of exhibits would be reduced from 500 to 300. (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,746).

Fox's counsel informed the court that "things are kind of where we were last time. I may have a couple fact witnesses to call, but they would be short, half an hour, 40 minutes each." (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,749). Also, Fox's counsel indicated a willingness to allow the government to call one witness to lay the foundation to admit evidence seized at multiple locations. (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,752-753).

The retrial began on August 9, 2022 and consistent with the court's plan, a jury was empaneled by the end of the day. (R. #696, Transcript of Final Pretrial Conference, PAGE ID #8,720) & (R. #837, Trial Transcript, Volume I, 14,388). There were no time limits for opening statements delivered the following day. The government's opening was captured in 20 pages of transcript, (R. #838, Trial Transcript, Volume II, PAGE ID #14,410-430), Fox's took 15 (R. #838, Trial Transcript, Volume II, PAGE

8

ID #14,430-445), and Croft's followed in 11.  (R. #838, Trial Transcript,

Volume II, PAGE ID #14,445-456).

Over the next seven trial days, the government called 17 witnesses.

There were no side bar discussions, and most issues and evidentiary

rulings were aired in the jury's presence.

On the first day of testimony, the court gave the defense wide

latitude to thoroughly cross-examine the government's witnesses.  (R.

#839, Trial Transcript Volume III, PAGE ID #14,658, 14675, 14,707, and

14,709). The following day, testimony was elicited about one of the

kidnapping plans discussed by Fox involving the extraction of Governor

Whitmer from her official residence on Mackinac Island using a Black

Hawk helicopter.  (R. #840, Trial Transcript Volume IV, PAGE ID

#14,994). After several questions were posed to Agent Schweers about this

plot, the government objected.  (R. #840, Trial Transcript Volume IV,

PAGE ID #14,995). In the presence of the jury, the court made the

following admonishment:

> THE COURT: We are getting into a lot of detail,
> and I guess, you know, the government's point is
> going to be they were thinking hard about plans,
> and your point is going to be they are ridiculous
> plans, and it seems like both sides have more than
> enough to make the argument. As I said before the

> break, we are going to be here until Thanksgiving
> if the parties don't start focusing on what the
> important issues are.

(R. #840, Trial Transcript Volume IV, PAGE ID #14,995).

After the jury was excused on August 12, 2022, the court closed the

proceedings by warning defense counsel:

> [T]he other thing, you know, I am going to think
> hard over the weekend about time limits because
> it's getting, in my view, ridiculous. We had Special
> Agent Reineck on for about two hours. Combined
> cross was about three hours. Special Agent Long
> three hours of cross on about an hour -- it was
> actually over three hours of cross on an hour of
> testimony, and so far we are in at almost two hours
> of cross here on a one and-a-half hour direct. I
> realize that Judge Bertelsmann's rule of
> proportionality isn't iron clad but it's a measure,
> and we haven't even started Mr. Croft's cross yet.
> So unless the Defendants in their cross and we get
> to the government's cross can start focusing the
> attention on something that really matters -- and
> some of you are making -- some of the lines of
> questioning are good points. I get why you want to
> make it. Don't muddy it up and clutter it up with
> all the other crap.
>                    * * * *
> MR. GIBBONS: Your Honor, if I can speak to
> scheduling? My estimation is that we could very
> well have this case concluded by next Friday at the
> rate we are going.
>
> THE COURT: Well, great. That's hard for me to
> believe at this rate but if it's true I will be a happy
> Judge.

10

MR. GIBBONS: We have three witnesses to power through.

THE COURT: Yeah, but one of them is CHS Dan.

MR. GIBBONS: I think he could be done in a day.

THE COURT: He wasn't done in a day last time, and everything is taking longer this time ironically, including issues that I would have thought were clean and easy to vet like exhibits. You know, you all know each other's exhibits by now. So you know, let's get it moving. See you next week.

(R. #840, Trial Transcript Volume IV, PAGE ID #15,020-021).

In a restricted access order filed on August 14, 2022, the court made the following observation about the "Bertelsman Rule:"

> [R]egarding the Rule 403 concerns of "undue delay, wasting time, or needlessly presenting cumulative evidence," the Court advised counsel that it would be considering over the weekend whether to impose time limits or other restrictions similar to those describe and imposed by Judge Bertelsman in *United States v. Reaves*, 636 F. Supp. 1575 (E.D. Ky. 1986). The Court highlighted, in particular, Judge Bertelsman's presumptive time limit on cross-examination limiting all crossing parties combined to the time used with the witness on direct exam. *Id.,* at 1581. The Court still thinks Judge Bertelsman's limit is a good rule of thumb, and one that actually tends to improve the impact a cross-examination. But the Court has decided not to impose it by Order—at least not yet— because (Croft's) defense counsel has recently observed and at least tacitly endorsed the underlying rationale in a public tweet:

> Truth. Cutting out the cross that just feels good but doesn't move the story is hard.
> Josh Blanchard (@joshuablanchard), TWITTER (Aug. 3, 2022, 6:09 PM), https://twitter.com/joshuablanchard/status/1554952545587568640?s=20&t=rM3sqSGmBlw4CSfvG-sivw.
>
> Yes, it's hard. But it can be done—and with powerful effect. The Court observes that similar principles apply to re-direct examinations.

(R. #711, Restricted Access Order, fn. 6, PAGE ID. #8988).

The "Bertelsman Rule" saber wasn't rattled on August 15th but it was the following day. During Confidential Human Source (CHS) Dan Chappel's cross-examination, the government voiced an objection to a question, believing it would lead to a speculative response, and the court responded:

> THE COURT: I mean, it seems like we've covered this to me, and you know, whether you ask him to characterize it as extensive or not isn't really the point. So I wish we would move onto something else that's new and different.
>
> MR. GIBBONS: Thank you, Your Honor.
>
> THE COURT: I am continuing to think about Judge Bertelsman.

(R. #842, Trial Transcript Volume VI, PAGE ID #15,317).

As the morning recess approached, Fox's counsel notified the court he was at a convenient point to break. When asked how much more time he needed to complete his cross of Chappel, counsel responded 45 minutes. (R. #842, Trial Transcript Volume VI, PAGE ID #15,353).

After the jury left the courtroom, the court informed counsel that:

> We're already 30 minutes beyond the Bertelsman rule and we haven't even heard from Mr. Croft yet. So I understand that it's a presumptive rule and I haven't imposed it, but you know, it's not that you don't have good points, it's just that I think they got lost in a lot of stuff that's hard to follow. So you know, words to consider, but it's obviously up to you.

(R. #842, Trial Transcript Volume VI, PAGE ID #15,353).

On redirect of Chappel, the government drew the court's ire for inefficiency. The government was challenged for: (a) using an exhibit that wasn't on its exhibit list (R. #842, Trial Transcript Volume VI, PAGE ID #15,466); (b) not getting "to the point" (R. #842, Trial Transcript Volume VI, PAGE ID #15,470); (c) asking argumentative questions (R. #842, Trial Transcript Volume VI, PAGE ID #15,471); (d) rehashing points that were already made on direct examination (R. #842, Trial Transcript Volume VI, PAGE ID #15,473); and (e) visiting issues on redirect that weren't

disputed on cross-examination. (R. #842, Trial Transcript Volume VI, PAGE ID #15,473).

At the end of the day on Tuesday August 16th, the government informed the court it would rest either Thursday or Friday, several days ahead of the date forecasted at the final pretrial conference. (R. #842, Trial Transcript Volume VI, PAGE ID #15,541-542). Additionally, Fox's counsel notified the court that his witnesses were available to testify on Thursday and his case would be "rather light." (R. #842, Trial Transcript Volume VI, PAGE ID #15,542).

The following day, the direct examination of Ty Garbin, a government cooperating witness, was concluded and defense counsel cross-examined. Garbin's cross-examination was concluded at 10:58 a.m. and he was followed by Agents Martinez and Clark, whose examinations were completed in 40 minutes. (R. #843, Trial Transcript Volume VII, PAGE ID #15,661-693). The government's next witness, Kaleb Franks, was also a cooperator. Before direct examination, the court announced, in the jury's presence: "[J]ust for counsel's planning benefit, the counsel ought to plan on the Bertelsman rule in effect for this witness." (R. #843, Trial Transcript Volume VII, PAGE ID #15,694). No explanation was

provided to the jury as to the meaning of the "Bertelsman Rule." No explanation was given as to why the rule applied to Franks. No time limits were set on the government.

Franks was sworn as a witness at 11:40 a.m. (R. #843, Trial Transcript Volume VII, PAGE ID #15,694) and his direct examination was completed at 12:28 p.m. (R. #843, Trial Transcript Volume VII, PAGE ID #15,738). The court informed counsel, out of the jury's presence, that because 50 minutes were spent on direct, no more time would be spent on cross-examination. (R. #843, Trial Transcript Volume VII, PAGE ID #15,738). Fox's attorney wanted to make a record on this issue before cross-examination, but the court wouldn't allow it. (R. #843, Trial Transcript Volume VII, PAGE ID #15,739).

During Fox's cross-examination, the government noted a hearsay objection. (R. #843, Trial Transcript Volume VII, PAGE ID #15,745). The court denied the objection and mockingly added, in the presence of the jury:

> THE COURT: It's fine for him. I have given him a time limit.
>
> MR. GIBBONS: You've never been –

> THE COURT: That's something that has been in evidence. If he wants to spend it that way that's fine. I don't think it's a hearsay problem. Go ahead.

(R. #843, Trial Transcript Volume VII, PAGE ID #15,745).

The court engaged in a time countdown during Fox's cross-examination: "You have about 15 to go" (R. #843, Trial Transcript Volume VII, PAGE ID #15,750); "you have about seven or eight minutes" (R. #843, Trial Transcript Volume VII, PAGE ID #15,756); and "two-minute warning" (R. #843, Trial Transcript Volume VII, PAGE ID #15,761). Finally, the court inquired of Fox's counsel: "[Y]ou have another topic?" and before counsel could answer, the court stated "You have used the time." (R. #843, Trial Transcript Volume VII, PAGE ID #15,763).

Croft was allotted 25 minutes to cross-examine Franks. When an objection was raised on the argumentative nature of the questioning, the court added, in the jury's presence, "[I]t is argumentative. It's redundant, too, but if that's the way you want to use your time." (R. #843, Trial Transcript Volume VII, PAGE ID #15,765). Like it did for Fox's counsel, the court also gave Croft's counsel time warnings.

After the jury was excused, the court allowed defense counsel to make a record on how the "Bertelsman Rule" impacted Franks' cross-examinations. Fox's counsel informed the court as to his approach to cross

examining government witnesses as well as how the "Bertelsman Rule" deprived him of his right to expose Franks' bias, motivation for testifying, as well as his lack of credibility. (R. #843, Trial Transcript Volume VII, PAGE ID #15,788-793).

The government declined to comment on the court's application of the "Bertelsman Rule." (R. #843, Trial Transcript Volume VII, PAGE ID #15,803). After hearing from Croft's counsel, the district court stuck to its application of the "Bertelsman Rule." (R. #843, Trial Transcript Volume VII, PAGE ID #15,804-808).

Just as quickly as the "Bertelsman Rule" was employed, it was shelved, and not used on any other witness. Agent Bates followed Franks and after his direct examination was completed, the court informed defense counsel, in the jury's presence:

> THE COURT: All right. We'll go to Mr. Gibbons for cross. And this is not subject to the Bertelsman rule. This is a different witness, a new witness and somebody that in my view doesn't present the same issues that I had on the other one. Go ahead.

(R. #844, Trial Transcript Volume VIII, PAGE ID #15,853).

At 1:08 p.m. on Thursday August 18, 2022, the government rested, almost 2 ½ days before it projected. To accommodate the travel schedule of two of Croft's witnesses, they were taken out of order.  (R. #844, Trial

Transcript Volume VIII, PAGE ID #16,012-025). Thirteen minutes of court time were used for these two witnesses.

The remainder of August 18th encompassed: discussing exhibits (R. #844, Trial Transcript Volume VIII, PAGE ID #16,026-033), arguing Rule 29 motions (R. #844, Trial Transcript Volume VIII, PAGE ID #16,033-038), the court's denial of the Rule 29 motions (R. #844, Trial Transcript Volume VIII, PAGE ID #16,038-042), a discussion as to the remainder of the defense witnesses (R. #844, Trial Transcript Volume VIII, PAGE ID #16,042-048), and modifications to the jury instructions (R. #844, Trial Transcript Volume VIII, PAGE ID #16,048-050). Finally, two defense witnesses indicated their intention to invoke their right against self-incrimination. (R. #844, Trial Transcript Volume VIII, PAGE ID #16,050-060).

The following day, Fox called two witnesses. For 20 minutes, Agent Hastings testified (R. #845, Trial Transcript Volume IX, PAGE ID #16,069-085) and by agreement, two minutes of Megan Cooley's prior testimony were read to the jury. (R. #845, Trial Transcript Volume IX, PAGE ID #16,086-088). After taking 22 minutes of court time, Fox rested. (R. #845, Trial Transcript Volume IX, PAGE ID #16,089).

18

In addition to the two witnesses called the previous day, Croft called three other witnesses on August 19th. These three witnesses took 61 minutes of court time, after which Croft rested. (R. #845, Trial Transcript Volume IX, PAGE ID #16,089-136). At the final pretrial conference, the court was informed the combined defense case might take two or three days; however, it took slightly more than 90 minutes.

### (c)    Sufficiency of the Evidence.

By the Spring of 2019, Barry Croft was under federal investigation because of his Facebook posts encouraging harm to law-enforcement.  (R. #839, Trial Transcript, Vol. III, Page ID #14,714-715). On September 9, 2019, Fox posted a meme on Facebook with the symbol for the III%ers, a recognized militia group. (R. #838, Trial Transcript Vol. II, PAGE ID #14,477). Within two weeks of this post, Fox and Croft were Facebook friends and regularly communicating about their shared militia beliefs. (R. #838, Trial Transcript Vol. II, PAGE ID #14,478 & 14488).

On December 9, 2019, Fox posted a Facebook video endorsing a "Boogaloo," a reference to a second civil war.  (R. #838, Trial Transcript Vol. II, PAGE ID #14,474). The Boogaloo and III%er movements had

common militia beliefs. (R. #838, Trial Transcript Vol. II, PAGE ID #14,477).

In response to the handling of the pandemic by some midwestern governors, Croft talked online about traveling to Ohio and hanging Governor DeWine. (R. #838, Trial Transcript Vol. II, PAGE ID #14,494). By early January 2020, Fox was posting pictures of flex cuffs and talking about arresting politicians. (R. #838, Trial Transcript Vol. II, PAGE ID #14,499-500).

Dan Chappel joined the Wolverine Watchmen militia group in March 2020. (R. #841, Trial Transcript, Vol. V, Page ID #15,063). Shortly after joining, however, Chappel became concerned with one of the group's goals—killing law enforcement officers. (R. #841, Trial Transcript, Vol. V, Page ID #15,064-065). Consequently, Chappel agreed to become an FBI informant and worked in that capacity until Fox was arrested.

The Wolverine Watchmen sponsored a political rally on April 15, 2020, at Michigan's Capital in Lansing. (R. #841, Trial Transcript, Vol. V, Page ID #15,071). The Watchmen used this event to both recruit new members and demonstrate its support for the Second Amendment. (R. #841, Trial Transcript, Vol. V, Page ID #15,072 & 15,205).

By May 2020, Chappel testified the Wolverine Watchmen group was talking about Governor Whitmer and by May 22nd, that group had acquired a photo of her vacation cottage on Birch Lake. (R. #841, Trial Transcript, Vol. V, Page ID #15,075).

On June 6, 2020, a meeting of various militia groups convened in Dublin, Ohio with a goal of uniting the different groups. (R. #839, Trial Transcript, Vol. III, Page ID #14,653 & 14,752). Before the meeting, the FBI knew Croft was trying to plan an operation but didn't know its target or dimension. (R. #839, Trial Transcript, Vol. III, Page ID #14,717).

There were three FBI informants in Dublin, C.M. Phillips, Steve Robeson, and Jenny Plunk, all of whom wore recording devices. Attendees at the Dublin meeting discussed kidnapping governors. (R. #839, Trial Transcript, Vol. III, Page ID #14,725). Fox was at the Dublin meeting and spoke of attacking "public office buildings, court houses, and Capitol buildings." (R. #839, Trial Transcript, Vol. III, Page ID #14,770). Fox also mentioned targeting Governor Whitmer. (R. #839, Trial Transcript, Vol. III, Page ID #14,727).

Two days after the Dublin meeting, Fox posted an online message: "[A]re you all ready to mobilize and take action? I am not talking about

rallies either, lol." (R. #838, Trial Transcript, Vol. II, Page ID #14,529). Fox also stated he was "starting my own thing. Second Continental Michigan Regiment." (R. #838, Trial Transcript, Vol. II, Page ID #14,529). Finally, Fox asked other chat group members if they were "[D]own to arrest the governor?" and "who is ready to take some politicians?" (R. #838, Trial Transcript, Vol. II, Page ID #14,530 & 14,533).

Another rally was staged at the Capitol in Lansing on June 18, 2020. (R. #842, Trial Transcript, Vol. VI, Page ID #15,071). Much like the one in April, the June rally had a Second Amendment component and was attended by many Wolverine Watchmen members as well as Fox.

At the June rally, Fox told Ty Garbin about his plan to storm the Capitol, arrest elected officials, try them for treason, and hang Governor Whitmer. (R. #842, Trial Transcript, Vol. VI, Page ID #15,505). This was also the first time Chappel met Adam Fox, who was carrying an AR-15 rifle and wearing body armor and a Hawaiian shirt, signifying his support for the Boogaloo. (R. #841, Trial Transcript, Vol. V, Page ID #15,078).

Two days after the second Lansing rally, a meeting convened at the Vac Shack in Grand Rapids, which was both Fox's place of employment and residence. (R. #841, Trial Transcript, Vol. V, Page ID #15,081). This

was a brainstorming session as well as an opportunity to unite different militias.  (R. #841, Trial Transcript, Vol. V, Page ID #15,224).

Fox, Ty Garbin, Paul Bellar, Amanda Keller (Fox's girlfriend), Jim McIntosh, and Chappel attended the Vac Shack meeting.  (R. #842, Trial Transcript, Vol. IV, Page ID #15,081 & 15,224) (R. #842, Trial Transcript, Vol. VI, Page ID #15,506).  Fox informed the attendees that before the November 2020 election, he would storm the Capitol with 200 men and execute Governor Whitmer. (R. #841, Trial Transcript, Vol. V, Page ID #15,083). There was also discussion about firebombing Michigan State Police Cars.  (R. #842, Trial Transcript, Vol. VI, Page ID #15,507).  Although multiple plans were discussed, Agent Reineck testified there was no specific attack plan reached at this meeting.  (R. #839, Trial Transcript, Vol. III, Page ID #14,624).

The day after the Vac Shack meeting, Fox posted an online message that "[I]t's time to take real action." (R. #838, Trial Transcript, Vol. II, Page ID #14,541). Fox also wrote he was "putting together an army of men from multiple militias and Michigan and about seven other states ATM (at the moment)." (R. #838, Trial Transcript, Vol. II, Page ID #14,541).

A field training exercise (FTX) occurred on June 28, 2020 in Munith, Michigan.  (R. #841, Trial Transcript, Vol. V, Page ID #15,237). Wolverine Watchmen members, Fox, and some of Fox's inner circle attended.  (R. #841, Trial Transcript, Vol. VI, Page ID #15,508). At the Munith FTX, Fox mentioned that Governor Whitmer needed to be arrested and hanged for treason.  (R. #842, Trial Transcript, Vol. V, Page ID #15,508). Fox also favored kidnapping "tyrants."  (R. #842, Trial Transcript, Vol. VI, Page ID #15,239).

The following day Croft posted a message that "Michigan's government is a target of opportunity.  If an opportunity presents we'll engage."  (R. #838, Trial Transcript, Vol. II, Page ID #14,543). Later, Croft wrote, "God knows the governor needs hung."  (R. #838, Trial Transcript, Vol. II, Page ID #14,544).

A second meeting was hosted by Fox at the Vac Shack on July 3, 2020.  However, only "Mark," an undercover FBI Agent, attended. (R. #840, Trial Transcript, Vol. IV, Page ID #14,908). "Mark" and Fox discussed Fox's plan for attacking the Capitol in Lansing. (R. #840, Trial Transcript, Vol. IV, Page ID #14,910-912).  They also discussed kidnapping and killing Governor Whitmer and taking hostages. (R. #840,

Trial Transcript, Vol. IV, Page ID #14,912-914). There was no date set for a mission (R. #840, Trial Transcript, Vol. IV, Page ID #14,967), but Fox recruited "Mark" to train. (R. #840, Trial Transcript, Vol. IV, Page ID #14,915).

FBI Informant Steve Robeson hosted a FTX at his property in Cambria, Wisconsin from July 10-12, 2020. (R. #839, Trial Transcript, Vol. III, Page ID #14,908). Croft, Fox, Ty Garbin, Dan Harris, Brandon Caserta, Paul Bellar, Chappel and Kaleb Franks attended the Cambria FTX. (R. #839, Trial Transcript, Vol. III, Page ID #14,908) & (R. #842, Trial Transcript, Vol. VI, Page ID #15,509-510).

The purpose of the Cambria FTX was to train and prepare. (R. #840, Trial Transcript, Vol. IV, Page ID #14,916). There were both "live fire" training and breaching exercises in a "kill" house. (R. #840, Trial Transcript, Vol. IV, Page ID #14,916). There was also medical training to simulate treatment of wounds suffered in a combat environment. (R. #842, Trial Transcript, Vol. IV, Page ID #15,511).

Croft brought materials from which he assembled explosive devices that wouldn't detonate because of lack of compression. (R. #839, Trial Transcript, Vol. III, Page ID #14,908) & (R. #841, Trial Transcript, Vol. V,

25

Page ID #15,257). Croft also discussed tactics for abducting Governor Whitmer. (R. #839, Trial Transcript, Vol. III, Page ID #14,742).

Later that evening, Croft informed the group he wanted to arrest Governor Whitmer and try her for treason. (R. #841, Trial Transcript, Vol. V, Page ID #15,094). According to Croft, they were training to target her, and Fox acknowledged explosives would be used. (R. #841, Trial Transcript, Vol. V, Page ID #15,095 & 15,258).

On July 17, 2020, Croft informed Joe Morrison, a leader of the Wolverine Watchmen, that he was ready to "pick it up several notches." (R. #838, Trial Transcript, Vol. II, Page ID #14,546). Additionally, Croft wrote that "I intend to start at your home state with a five-state coalition." (R. #838, Trial Transcript, Vol. II, Page ID #14,546).

The following day, a meeting convened in Peebles, Ohio. (R. #841, Trial Transcript, Vol. V, Page ID #15,097). This was a follow-up to prior meetings and another purpose was to solidify targets. (R. #842, Trial Transcript, Vol. VI, Page ID #15,513). At this meeting, for the first time, Fox mentioned the feasibility of targeting the governor's vacation cottage on Birch Lake. (R. #842, Trial Transcript, Vol. VI, Page ID #15,514-515). At the Peebles meeting, Croft spouted several missions including

firebombing Michigan State Police cars, committing robberies to raise funds, and storming midwestern state capitols to sow chaos. (R. #842, Trial Transcript, Vol. VI, Page ID #15,513-514).

On July 19, 2020, Fox informed Chappel he'd spoken with the "baker" (bomb maker) about making "cupcakes and cakes" (bombs) and planned to meet him. (R. #841, Trial Transcript, Vol. V, Page ID #15,104) & (R. #842, Trial Transcript, Vol. VI, Page ID #15,289). Chappel understood the "baker" to be Matthew Keepers. (R. #841, Trial Transcript, Vol. V, Page ID #15,289)

Keepers confirmed Fox contacted him to purchase explosives. (R. #842, Trial Transcript, Vol. VI, Page ID #15,289 & 15,491). However, Keepers declined Fox's offer and Fox later informed Chappel that his "baker" wasn't working out. (R. #842, Trial Transcript, Vol. VI, Page ID #15,291 and 15,492).

During a conversation on July 27, 2020 with Chappel, Fox talked about kidnapping Governor Whitmer and targeting her at her official residence on Mackinac Island was the best option. (R. #841, Trial Transcript, Vol. V, Page ID #15,106-107).

On August 5, 2020, Fox posted online that "[W]e building couple of elite units though" and "we aren't just training without a purpose, if you catch my drift." (R. #838, Trial Transcript, Vol. II, Page ID #14,547). Later that day, Franks, Garbin, and Daniel Harris were hiking on Harris's property at Lake Orion. (R. #843, Trial Transcript, Vol. VII, Page ID #15,747) During the hike, Franks and Garbin agreed to join the conspiracy to abduct Governor Whitmer. (R. #843, Trial Transcript, Vol. VII, Page ID #15,747).

On August 1, 2020, "Mark" met with Fox at Sean Fix's house in Belleville, Michigan to meet and train other militia members. (R. #840, Trial Transcript, Vol. IV, Page ID #14,922-923). At this meeting, Fox discussed the three options for abducting Governor Whitmer: (a) by assaulting the Capitol building in Lansing, (b) at her summer residence on Mackinac Island, and (c) at her Birch Lake vacation cottage. (R. #840, Trial Transcript, Vol. IV, Page ID #14,926). Additionally, Fox discussed the need to determine which location was most advantageous. (R. #840, Trial Transcript, Vol. IV, Page ID #14,926) & (R. #842, Trial Transcript, Vol. VI, Page ID #15,317 & 15,467-468). Eventually, the first two targets

were abandoned in favor of the third. (R. #842, Trial Transcript, Vol. VI, Page ID #15,468).

A second FTX in Munith occurred on August 9, 2020. (R. #841, Trial Transcript, Vol. V, Page ID #15,108). Fox, Sean Fix, Joe Morrison, Ty Garbin, and Chappel attended. (R. #841, Trial Transcript, Vol. V, Page ID #15,108). The training included ambushing and taking over vehicles, room clearing, and medical treatment. (R. #841, Trial Transcript, Vol. V, Page ID #15,108). Fox also talked about Governor Whitmer and "taking the offensive." (R. #841, Trial Transcript, Vol. V, Page ID #15,109).

Twenty days later, a daytime reconnaissance of Governor Whitmer's cottage was completed by Fox, Chappel, and Eric Molitor. (R. #841, Trial Transcript, Vol. V, Page ID #15,119). Photos and a video of the cottage were taken during this trip. (R. #841, Trial Transcript, Vol. V, Page ID #15,120 & 15,138) (R. #842, Trial Transcript, Vol. V, Page ID #15,329). After imaging the cottage, the three went to a boat launch on Birch Lake and observed the Governor's house from the launch. Fox noted more reconnaissance was necessary. (R. #841, Trial Transcript, Vol. V, Page ID #15,135) & (R. #842, Trial Transcript, Vol. VI, Page ID #15,520).

Fox informed Chappel that accomplishing the Mackinac Island plan would be difficult. Fox also told Chappel he wanted to inspire others and motivate "fence sitters" to action and his plan included blowing up a bridge near the cottage. (R. #842, Trial Transcript, Vol. VI, Page ID #15,340-341).

At lunch after the reconnaissance, Fox drew a map of the area identifying the cottage, Birch Lake, the boat launch, and response distances for local police departments around Elk Rapids. (R. #841, Trial Transcript, Vol. V, Page ID #15,124-127). A footpath between Birch Lake and Lake Michigan was also noted. (R. #841, Trial Transcript, Vol. V, Page ID #15,124-127).

On September 4, 2020, Fox sent a chat message to Chappel including a list of the gear needed to kidnap Governor Whitmer which included flash bangs, a hood, flex cuffs, a stun gun, and the ability to deal with her security detail. (R. #841, Trial Transcript, Vol. V, Page ID #15,140-145) & (R. #843, Trial Transcript, Vol. VII, Page ID #15,558).

Ty Garbin hosted a FTX at his property in Luther, Michigan from September 11th -12th. (R. #839, Trial Transcript, Vol. III, Page ID #14,743) and (R. #842, Trial Transcript, Vol. VI, Page ID #15,354). While traveling

with Chappel to Luther, Fox talked about the timing of the kidnapping and Chappel introduced the prospect that Governor Whitmer might become a cabinet member if Joe Biden were elected President. (R. #842, Trial Transcript, Vol. VI, Page ID #15,354). This was likely done to spur Fox to action. Fox responded that his training was inadequate and Chappel responded that delaying the mission would push it until spring or summer. (R. #842, Trial Transcript, Vol. VI, Page ID #15,355-356).

Because Matthew Keepers declined to sell Fox explosives, at the Luther FTX, Chappel introduced "Red," an undercover FBI agent, as the "baker." (R. #844, Trial Transcript, Vol. VIII, Page ID #15,829-831). To sell his role, "Red" shared videos showing C-4 explosives destroying vehicles. (R. #840, Trial Transcript, Vol. IV, Page ID #14,922-923). According to "Red," Fox and Croft were "excited" by the videos and Fox inquired about the quantity of explosives needed. (R. #844, Trial Transcript, Vol. VIII, Page ID #15,836-837).

Those attending the Luther FTX trained in close quarters combat, medical treatment, and weapons manipulation. (R. #844, Trial Transcript, Vol. VIII, Page ID #15,833). Garbin also constructed a "kill" house on his property to mimic the outside of the Governor's cottage. (R. #841, Trial

Transcript, Vol. V, Page ID #15,148 & 15,257) & (R. #842, Trial Transcript, Vol. VI, Page ID #15,522). Along with others, Fox and Croft trained in this house. During the FTX, Fox also spoke to "Mark" about the need to blow up a bridge near the Governor's vacation cottage. (R. #840, Trial Transcript, Vol. IV, Page ID #14,931 & 15,001).

After training on September 11th, a nighttime reconnaissance occurred of the Governor's cottage. Three vehicles transported 11 people from Luther to Birch Lake. (R. #842, Trial Transcript, Vol. VI, Page ID #15,150). Four of the 11 were either undercover FBI agents or informants (Chappel, "Red", Robeson, and "Mark") & (R. #840, Trial Transcript, Vol. IV, Page ID #14,932). The other seven were Fox, William and Michael Null, Croft, Franks, Garbin, and Brian Higgins. (R. #840, Trial Transcript, Vol. IV, Page ID #14,932).

After arriving in Elk Rapids, the 11 people were shuffled among the three vehicles and Fox gave each vehicle assignments. (R. #840, Trial Transcript, Vol. IV, Page ID #14,932). One vehicle was to generally surveil the area, one was to drive-by the cottage, and one was to drive to the Birch Lake boat launch to view the cottage. (R. #840, Trial Transcript, Vol. IV, Page ID #14,935).

Fox and Croft were in the vehicle assigned to the boat launch. (R. #841, Trial Transcript, Vol. V, Page ID #15,152). While driving to the launch, the vehicle drove over a bridge on M-31, the vehicle stopped, and Fox and "Red" exited. (R. #841, Trial Transcript, Vol. V, Page ID #15,150). Both Fox and "Red" went under the bridge, took pictures, and discussed the placement of explosives to detonate the bridge. (R. #841, Trial Transcript, Vol. V, Page ID #15,150) & (R. #844, Trial Transcript, Vol. VIII, Page ID #15,843).

The car assigned to drive-by the governor's house never located it because they had the wrong address. (R. #840, Trial Transcript, Vol. IV, Page ID #15,001-003).

According to the testimony, Fox's kidnapping plan started at the boat launch. (R. #840, Trial Transcript, Vol. IV, Page ID #15,002). "Mark" would steal a boat, put it in the water, float it to the cottage, and kill the Governor's security team. (R. #840, Trial Transcript, Vol. IV, Page ID #15,001-005). Fox and his team would kidnap Governor Whitmer, put her in either "Mark's" boat or a vehicle, take her back to the boat launch, transport her across the foot bridge to Lake Michigan, put her in another stolen boat, set her adrift into Lake Michigan, and the motor would be

dropped from the boat. (R. #840, Trial Transcript, Vol. IV, Page ID #15,001-005). The purpose of this plan, according to Garbin, was to create a "massive inconvenience to the governor." (R. #843, Trial Transcript Vol. VII, PAGE ID #15,646).

The morning after the reconnaissance, there was a meeting at Garbin's property where Croft also raised the prospect of Governor Whitmer becoming a cabinet member in the Biden Administration and the Secret Service protection that would follow. (R. #843, Trial Transcript, Vol. VII, Page ID #15,555). Croft offered he'd previously used his semi-truck to run Secret Service details off the road and he could use his grenade launder to engage them. (R. #841, Trial Transcript, Vol. V, Page ID #15,159) & (R. #843, Trial Transcript, Vol. VII, Page ID #15,555-556).

At the same meeting, Fox discussed the results of the reconnaissance and the need to continue training. (R. #843, Trial Transcript, Vol. VII, Page ID #15,723). Fox told the group they needed to be opportunistic because it was unknown when Governor Whitmer would visit her cottage. (R. #843, Trial Transcript, Vol. VII, Page ID #15,556).

After the meeting, there was "live fire" training at the "kill" house. (R. #840, Trial Transcript, Vol. IV, Page ID #15,555). Later, Croft

assembled and exploded a destructive device. (R. #843, Trial Transcript, Vol. VII, Page ID #15,555) & (R. #844, Trial Transcript, Vol. VIII, Page ID #15,986).

Before leaving Luther, Fox ordered $4,000.00 worth of explosives and $600.00 worth of flash bangs from "Red." (R. #844, Trial Transcript, Vol. VIII, Page ID #15,850-853 & 15,875). According to "Red," he told Fox the explosives would be delivered on October 31, 2020 but he had no intention of delivering them. (R. #844, Trial Transcript, Vol. VIII, Page ID #15,834 & 15,853).

Fox and Croft told the attendees at the Luther FTX about the cost of the explosives. Everyone was to chip in to make the purchase, but Fox and Croft would shoulder most of the expense. R. #842, Trial Transcript, Vol. VI, Page ID #15,375) & (R. #843, Trial Transcript, Vol. VII, Page ID #15,556).

There was uncertainty when the mission would be completed. After being prodded by Chappel, Fox now wanted to complete it before the election while others wanted to wait. (R. #841, Trial Transcript, Vol. V, Page ID #15,163). The agreement that was forged at the Luther FTX

required everyone to return home and train. (R. #841, Trial Transcript, Vol. V, Page ID #15,163).

Fox wanted to train indoors for close quarter combat and offered the Vac Shack as a location. (R. #841, Trial Transcript, Vol. V, Page ID #15,165). However, this training never occurred. Additionally, Fox encouraged everyone to get as many reps as possible and he was working on "acquiring an asset and detaining for extraction." (R. #841, Trial Transcript, Vol. V, Page ID #15,165-166).

Before the November election, there was to be one final FTX in Cambria, Wisconsin. (R. #841, Trial Transcript, Vol. V, Page ID #15,163), (R. #842, Trial Transcript, Vol. VI, Page ID #15,452) & (R. #843, Trial Transcript, Vol. VII, Page ID #15,729). It never occurred.

With Fox's takedown imminent, on September 30, 2020, Chappel asked Fox to give "Red" a couple hundred dollars as a "good faith" payment for the explosives. (R. #841, Trial Transcript, Vol. V, Page ID #15,166-167). Fox and others were lured to Ypsilanti for arrest based on "Red's" offer of free tactical gear. (R. #839, Trial Transcript, Vol. III, Page ID #14,631-634). Consequently, the trip to Ypsilanti was to pick up "Red's" free gear, not a bomb. (R. #842, Trial Transcript, Vol. VI, Page ID #15,373).

According to Chappel, the bomb was going to be delivered "the following month on the 7th" (November 7th). (R. #842, Trial Transcript, Vol. VI, Page ID #15,373).

On October 7th, when he was arrested, Fox possessed $276.13 in cash and a stun gun. (R. #844, Trial Transcript, Vol. VIII, Page ID #15,918-920). While detained, Fox told Garbin he'd brought around $300.00 to Ypsilanti as a good faith payment to give to "Red." (R. #843, Trial Transcript, Vol. VII, Page ID #15,559).

After the arrests, numerous searches occurred resulting in the seizure of evidence. Both Franks and Garbin testified the weapons, ammunition, silencer, first aid kits, bullet proof vests and helmets, and goggles seized from their properties were to be used to kidnap Governor Whitmer. (R. #843, Trial Transcript, Vol. VII, Page ID #15,562-66 & 15,730-732). A search of the Vac Shack yielded weapons, a helmet, $600.00 in cash, flex cuffs, body armor, and a gas mask. (R. #843, Trial Transcript, Vol. VII, Page ID #15,673-687).

### (d)    Informants' Statements were not Admitted Under Fed. R. Evid. 801(d)(2)(D).

From their birth, the conspiracies charged in this case were both infiltrated and closely monitored by government operatives including

several undercover FBI agents and numerous informants tasked by their handlers. Fox's defense was he was entrapped and not otherwise predisposed to violate the law. Critical to Fox's defense was the need to show his jury the complete and incessant communications between the informants and their handlers.

This was particularly true with informant Dan Chappel and his handler, Agent Chambers; they exchanged 3,236 messages between March 16, 2020 and October 8, 2020. (R. #666, Brief, p. 2, PageID#8385). Many of these messages goaded Chappel into action, critiqued Chappel's performance, and offered suggestions to move Fox beyond rhetoric into prosecutable actions. Equally important were Chappel's responses to his handler's statements.

In a pretrial pleading, Fox gave notice of his intention to admit the entirety of the FBI Agents' communications and he attached the conversations he sought to admit. (R. #383, Defendant's Motion, PAGE ID #2554-2620) and (R. #666-1, Brief, PAGE ID #8389-8506). The district court concluded the agents' statements made in the scope of their duties were admissible as party-opponent admissions, under Fed. R. Evid. 801(d)(2)(D). (R. #439, Order, PAGE ID #3010). However, the defense

also needed to show the statements were relevant to gain their admission. (R. #439, Order, PAGE ID #3010).

Additionally, Fox sought to admit the entirety of the informants' conversations with their handlers and these messages were also attached. (R. #666-1, Brief, PAGE ID #8389-8506). Fox argued the informants' statements were admissible because: (a) some weren't offered to prove the truth of the matter asserted; and (b) for those offered to prove their truth, they were admissible under Rule 801(d)(2)(D). (R. #439, Order, PAGE ID #3010-11).

According to the district court, admitting statements not for the truth of the matter asserted would result in a "trial by hearsay" to give the statements proper context and relevancy. (R. #439, Order, PAGE ID #3011-12). Consequently, this basis for admission was denied. (R. #439, Order, PAGE ID #3011-12).

The district court also ruled that "that except for a narrow category of statements where the CHSs acted as a mere conduit for the words of the government agents, the statements from the CHSs are inadmissible hearsay.  Such statements come in, if at all, only when the declarant is testifying in Court."  (R. #439, Order, PAGE ID #3011).

## SUMMARY OF ARGUMENT

On the second day of testimony, credible evidence of juror misconduct and bias was proffered to the district court. Most of this information was later corroborated by the court's jury clerk. Despite wanting to examine the juror about the misconduct, Fox's attorney was denied the ability to question the juror or even be present when he was questioned by the district court in an *in camera* proceeding. The district court's procedure deprived Fox of a constitutionally meaningful *Remmer* hearing.

The district court previously told counsel that time limits had never been imposed in a criminal case and at the retrial, they should expect the same procedure experienced at the first trial. Nonetheless, at the retrial, the district court-imposed time limits for cross-examining one of the government's star witnesses, Kaleb Franks. This restriction impacted Fox's ability to show Franks' bias and motivation for testifying. It also deprived Fox of the opportunity to elicit evidence supporting his entrapment defense.

Next, Fox suffered a manifest injustice when he was convicted on counts one and two when the record is devoid of evidence to show an

agreement was formed, Governor Whitmer's transgressors would realize a benefit from their plan, and that she didn't consent to the plan.

Finally, Fox was deprived of his right to present a defense when the district court ruled that the informants' communications with their handlers were not admissible as party-opponent admissions under Fed. R. Evid. 801(d)(2)(D).

## ARGUMENT

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY DEPRIVING FOX OF A "CONSTITUTIONALLY MEANINGFUL" *REMMER* HEARING.

**Standard of Review**: The court's decision regarding the procedure used to investigate alleged juror misconduct is reviewed for abuse of discretion. *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017). District courts wield "considerable"—but not infinite—discretion when deciding how to conduct a *Remmer* hearing. *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021).

The Sixth Amendment guarantees the right to be tried by an "impartial jury." "The presence of even a single biased juror deprives a defendant of [their] right to an impartial jury." *Lanier*, 988 F.3d at 294. When a court is presented with evidence of juror bias, it must hold a "hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954). Recently, in *In re Sittenfeld*, 49 F.4th 1061 (6th Cir. 2022), this Court summarized the procedure to be

41

employed at *Remmer* hearings. "Unauthorized invasions" on the jury proceedings can oblige the trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 1066.

This circuit stands alone by placing the burden of establishing juror bias on the defendant. *Lanier*, 988 F.3d at 295. Consequently, defendants are entitled to a "constitutionally meaningful *Remmer* hearing" and a district court abuses its discretion by denying a defendant a "meaningful opportunity" to demonstrate jury bias. *Id.*

To ensure an "adequate" investigation of jury bias, the district court must permit "all interested parties" to "participate" at the hearing "to comport with due process." *Id.* The hearing must be "unhurried and thorough." *Id.* Additionally, defense counsel must be allowed to question the jury, unless counsel for both parties agree to allow the court to conduct the questioning. *Id.*

The facts supporting this assignment of error are immutable. On the second day of testimony, Croft's counsel informed the court of the facts supporting his belief that a juror was biased. In sum, the lawyer received a phone call the night before from the juror's co-worker. The caller

identified the juror by name and provided his physical description. He also provided an unusual fact identifying the juror—the juror relied on his father to bring him to and from court for jury service.

According to the caller, the juror told "people" he'd been summoned for jury duty and hoped it was the Whitmer case.  The juror told these "people" the defendants were guilty and he was going to hang them. The court recognized, if true, these statements spelled juror misconduct.

The caller provided his name and phone number which Croft's counsel provided to the court. After making a proffer, counsel for both Croft and Fox notified the court they wanted to question the juror and jury before proceeding that day. This request was rebuffed as the court went into "investigation mode."

The court's jury clerk confirmed much of the information provided by Croft's counsel.  However, one important fact was added—the juror violated the court's admonition to not talk to anyone about the case by contacting a co-worker on a break from the trial.  During this call, the juror allegedly told his co-worker the defendants were guilty and would hang.

The district court, in an order filed after the *ex parte* meeting with the juror, confirmed that the jury clerk's interview "included some similarities" to the information relayed by Croft's counsel. However, the court noted some of the information was different in several material respects. First, the juror hadn't spoken to the caller. However, Croft's counsel specifically informed the court the juror made these comments to "people," not "the caller." Second, "the caller" wouldn't identify the "people" to the clerk, so the conversations couldn't be confirmed.

Counsel for both Croft and Fox clearly notified the court they wanted to participate in questioning the juror to make the record on bias; however, these requests were denied. The government agreed with the court's approach.

In a post-trial order, the court stated it denied counsels' request for a *Remmer* hearing because "they have not provided the credible evidence or allegations necessary to trigger such a hearing." (R. #779, Order, PAGE ID 10,230). However, the court's actions belie this conclusion.

After the misconduct issue was brought to the court's attention, it didn't dismiss it out of hand. Instead, the jury clerk was tasked with investigating the allegation and reporting to the court. After that

occurred, the court reported to counsel it was convening an *ex parte* meeting to probe the juror's ability to be fair and impartial. The case law is clear these meetings should only occur, mid-trial, when there's a strong indicator of bias. *United States v. Stafford*, 136 F.3d 1109, 1113 (7th Cir. 1998). This is so because mid-trial meetings have an unsettling impact on the juror. *Id.* In sum, the proffer of the juror's bias was credible given the court's need to flesh out the issue. The jury clerk confirmed Croft's lawyer's proffer as well as established one additional fact—the juror contacted a co-worker while on break from the trial.

The *Remmer* hearing in *Lanier*, which this Court found wanting, allowed the defendants *some*, but not a *meaningful*, opportunity to satisfy their burden to demonstrate jury bias. The *Lanier* panel concluded that cross-examining jurors and witnesses may sometimes suffice, but "[t]o repeat, the greater the doubts, the more probing the inquiry that is required." *Lanier*, 988 F.3d at 297.

Here, Fox wasn't provided *any* opportunity to demonstrate juror bias. Instead, he had to rely on the court's *ex parte* interview, which his lawyer wasn't even permitted to attend. To develop the record on juror bias, this court in *Lanier* recognized that counsel must have an opportunity to

question the juror. The exception to this rule only arises if the parties agree the court should question the juror and Fox never consented.

At the *ex parte* meeting, the court didn't even place the juror under oath. Instead, the court simply informed the juror they were in "a private meeting at this point" and the conversation was being transcribed so that it might be shared with the lawyers.

The court's handling of this issue deprived Fox of a constitutionally meaningful *Remmer* hearing. There was a credible allegation of juror bias and contact with external parties in need of investigation. Under this Court's jurisprudence, Fox had the burden of proving bias. Because the district court failed to afford Fox a constitutionally meaningful opportunity to develop the record on juror bias, this case must be remanded for a new trial. *Id.* at 298.

## II. THE DISTRICT COURT ABRIDGED FOX'S RIGHT OF CONFRONTATION BY ARBITRARILY RESTRICTING FOX'S CROSS-EXAMINATION OF KALEB FRANKS.

**Standard of Review:** "[E]ven when the core values of the Sixth Amendment are invaded by a denial of cross-examination, ... the standard of review is abuse of discretion, abuse being found where the trial court has interfered with the defendant's constitutional right." *Dorsey v. Parke,* 872 F.2d 163, 166 (6th Cir. 1989). When the cross-examination of the government's "star" witness is curtailed, a trial court's ruling must be carefully scrutinized, but the test remains whether the jury had enough information to assess the defense theory. *Id.* at 166–67.

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., amend. VI. This right includes the right to cross-examine those witnesses' credibility. *United States v. Martin,* 920 F.2d 393, 396 (6th Cir. 1991). "A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *United States v. Shaver*, 89 Fed. App'x 529, 533 (6th Cir. 2004). This would include "*facts* from which bias, prejudice or lack of credibility of a prosecution witness might be inferred." *United States v. Garrett,* 542 F.2d 23, 25 (6th Cir. 1976).

The right to cross-examination, however, is not unbounded. Instead, this right guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985). A decade ago, this Court found the proper analysis in determining whether counsel was granted an opportunity for effective cross-examination asks whether the jury had enough information to assess the

defense theory, despite any court-imposed limitations. *McPherson v. Woods*, 506 Fed. App'x 379, 390 (6th Cir. 2012).

Before the trial commenced, the government's case-in-chief was forecasted to take ten days whereas the combined defense case would take two or three. The court had neither opposition to these projections nor voiced a complaint about the first trial's pace.  At the retrial, the defense even assisted in streamlining the government's case.

During the first trial, the court offered that although time limits were routinely imposed in civil cases, they had never been imposed in criminal cases. Additionally, before the retrial, the court notified counsel to "plan your case assuming the same basic ground rules that I said in the first round." Time limitations on direct and cross-examination were neither mentioned by the court nor sought by the parties. A jury was selected within the time allotted and no time limits were placed on opening statements, which were completed with alacrity.

During the cross-examination of the first witness, government objections were denied to the form of questions with the court simply noting "it was cross-examination."  When the same topics were covered by both defense counsel, the court didn't intervene.  However, tolerance for

testing the government's case waned the following day when Croft's counsel engaged in argumentative questioning. The same was true when both defense counsel covered the same topics.

For the rest of the trial, the court's handling of the case was driven by its desire to move the case along. The court's priority was freely advertised in the jury's presence even though the trial would finish well ahead of the pretrial projections.

On the third day of the trial, the court first mentioned the "Bertelsman Rule." In response, Fox's counsel assured the court the case was going to be in the jury's hands sooner than anticipated. The "Bertelsman Rule" was twice broached by the court on the fifth day of testimony. The same day, the court also castigated the government for perceived inefficiencies.

Later that day, the government called Ty Garbin as a witness, who was one of the indicted co-conspirators who'd pleaded guilty, becoming a "star witness" at Fox's trial. Garbin's direct exam was not completed by the end of that day. After the jury was excused, the government informed the court it would rest well ahead of schedule. The following day, Garbin's direct and cross-examinations were completed. After two quick witnesses,

the government called Kaleb Franks, the other "star witness" who'd pleaded guilty and cooperated.

Without forewarning, the court, in the presence of the jury, informed defense counsel the "Bertelsman Rule" was in effect. Although the jury heard this phrase several times, it was left wondering what it meant or why it was imposed.  Finally, the jury was left wondering why it was applied only to the defense.

From the court's comments made during cross-examination of some government witnesses, it was obviously unimpressed by counsels' approach. The court didn't hesitate to sprinkle gratuitous comments about this perceived inadequacy before the jury.  Those comments, especially with the added sarcasm, were not justified. *United States v. Dellinger*, 472 F.2d 340, 387–88 (7th Cir. 1972).

The genesis of the "Bertelsman Rule" is found in *United States v. Reaves*, 636 F. Supp. 1575 (E.D. Ky 1986).  This was a tax fraud case where the government projected its case-in-chief would take a month.  *Id.* at 1576. In a pretrial conference, Judge Bertelsman discussed imposing a time limit for the government's case and invited parties to brief the issue.

*Id.* at 1577. Before the trial commenced, Judge Bertelsman crafted a scheduling order imposing time limits for the trial's various phases. *Id.*

In *Reaves*, limits were imposed on both sides. *Id.* at 1581. "Absent exceptional circumstance," the time for cross examination "by all other parties cumulatively" was limited to time used on direct examination. *Id.* In the end, Judge Bertelsman concluded his opinion by noting that "the court must analyze each case carefully to assure that the time limits set are not arbitrary." *Id.* at 1580.

The court in Fox's case imposed the "Bertelsman Rule" arbitrarily depriving Fox of his right to cross examination a "star witness" to elicit his bias and prejudice, his motivation for testifying, and facts to support Fox's entrapment defense.

There were many differences in *Reaves* and Fox's cases. First, the time limits were imposed in *Reaves* before the trial started. In Fox's case, the parties were told to expect the same procedure used in the first trial.

The parties were given the opportunity to brief the issue in *Reaves* whereas it was sprung on counsel in mid-trial in Fox's case. No opportunity was afforded to even argue the issue until after Franks' cross-examination was completed.

The time limitations in *Reaves* were imposed on both sides whereas they were only imposed on the defense in Fox's case. Throughout Fox's trial, most of the court's desire to move the case along was focused on defense counsel. Despite the court noting five government inefficiencies in its conduct of the trial, it was spared the "Bertelsman Rule."

The impetus for the time limit in *Reaves* was the government's unwillingness to use summary charts to avoid mind-numbingly dry testimony. In Fox's case, the time limits were directed at the length of cross-examination of one of the government "star" witnesses.

The court's time limitation was absolute in Fox's case. In contrast, there was wiggle room in *Reaves* if counsel could establish "exceptional circumstances" justifying a longer examination.

Finally, the *Reaves* decision doesn't indicate if this issue was bandied in front of the jury. However, in Fox's case, the court used the eponymous phrase numerous times, never explained it to the jury, and used the phrase in a way to signal to the jury the defense was wasting time. Oddly, the jury was also never instructed why the rule applied to Kaleb Franks' cross-examination and not to the following witness.

Fox's counsel articulated his reasons for approaching cross-examinations he'd already completed: (1) Fox was at every event, on every phone call, and at every training; (2) the government elicited evidence at the first trial that was helpful to Fox's entrapment defense as well as the ridiculous nature of the kidnapping plans but this evidence was avoided at the retrial; and (3) Agent Reineck's inability to answer a straightforward question.

Fox's counsel estimated he needed only 20-30 more minutes to finish crossing Franks and the arbitrary time limitations deprived him of the ability to cover the following areas: (1) Franks' plea agreement; (2) Franks' participation in the shoot house training in Luther; (3) Franks' role in the alleged conspiracy; (4) Franks' decision to participate in the conspiracy; (4) the role of the dash cam used to capture one of the trips to Governor Whitmer's cottage; (5) Franks' arrest and how that impacted Fox's entrapment defense; (6) Franks' claim that Fox possessed a firearm when the nighttime reconnaissance was done at Governor Whitmer's cottage; (7) Franks' knowledge about the role of Dan Chappel in the Wolverine Watchmen; (8) Franks' knowledge about Fox's claim that he'd alter his appearance after the kidnapping; and (9) Franks' knowledge about the

groups' LARPING (live action role playing) and how that related to one of the "fantastical" kidnapping plans.

In sum, the district court abused its discretion by implementing the "Bertelsman Rule," its arbitrary application adversely affected the defense, and deprived Fox of his Sixth Amendment right to fully confront one of the government's "star" witnesses. This deprivation left the jury without enough information to assess Fox's entrapment defense and Franks' bias and credibility.

## III. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT FOX'S CONVICTIONS.

**Standard of Review:** This Court reviews preserved sufficiency of evidence claims under the standard announced in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). For unpreserved sufficiency claims, however, this Court reviews them under the manifest-miscarriage-of-justice standard and will "only reverse a conviction if the record is devoid of evidence pointing to guilt." *United States v. Guadarrama*, 591 Fed. App'x 347, 351 (6th Cir. 2014).

Fox's Rule 29 argument only addressed the government's failure to establish that he was predisposed to join the charged conspiracies. (R. #844, Trial Transcript, Vol. VIII, Page ID #16,033-036). The court denied Fox's motion (R. #844, Trial Transcript, Vol. VIII, Page ID #16,038-042), Fox renewed it at the close of his case, and it was again denied. (R. #845, Trial Transcript, Vol. IX, Page ID #16,144).

However, on appeal, Fox raises the following three sufficiency of the evidence challenges that were not raised in the district court: (1) the failure prove an agreement for counts one and two; (2) the failure to prove the transgressors would enjoy a benefit from the kidnapping plan; and (3) the failure to prove there was a lack of consent on count one.

### (a)   Failure to Prove an "Agreement."

A finding of conspiracy does not require proof of formal agreement; a mere tacit understanding among the participants is sufficient." *United States v. Harrison*, 663 Fed. App'x 460, 464 (6th Cir. 2016). That tacit understanding need not be proven by direct evidence; it "may be proven by circumstantial evidence, including by the defendant's participation in a common plan." *United States v. Lang*, 717 Fed. App'x 523, 545 (6th Cir. 2017).

The government's case-in-chief revealed that Fox and other militia members were full of ideas and beliefs that might be repugnant to most. A person cannot be prosecuted for his beliefs and ideas, however, he can be prosecuted for his actions.

After the first Vac Shack meeting, Agent Reineck testified there was no specific plan. As time marched on and the rhetoric became hotter, the

plans proposed by the militia members became more fanciful and fantastic, but the participants' actions failed to keep pace. The evidence showed the government's agents and informants attempted to focus Fox and others, so their actions fit their braggadocio.

The Luther FTX on September 11th and 12th was less than sixty days before the presidential election. To prod the militia members to formulate a prosecutable plan, CHS Dan Chappel dropped a not-so-subtle hint in an attempt to bring them within the sweep of conspiracy law. Chappel suggested that Governor Whitmer could become a member of President Biden's cabinet affording her more personal protection than she currently had as governor. In response, Fox informed Chappel that his training was inadequate, clearly indicating he didn't want to proceed. However, Chappel wouldn't take no for an answer and told Fox that if the mission didn't happen before the election, it would be delayed until either the spring or summer of 2021.

When Fox's source for explosives wouldn't sell him explosives, the FBI introduced an undercover agent to pose as an explosives dealer. Chappel instructed Fox to bring "good faith" money to give to "Red" in

Ypsilanti. However, "Red" wasn't present in Ypsilanti and had no intention of ever selling explosives to Fox.

Most importantly, there was no agreement when the mission was to occur. Despite telling Chappel that his skills were deficient, Fox changed his mind after the Luther FTX and now wanted to proceed before the election while others wanted to wait. At this time, there was to be one more FTX before the mission, but it never occurred. Without an agreement on when the mission should occur, the conspiratorial agreement wasn't formed. Instead, the only agreement in place after the Luther FTX in September was everyone was to return home and train.

The government's evidence to prove the existence of conspiratorial agreements for counts one and two after the Luther FTX was wanting. Because the record is devoid of any evidence pointing to the existence of an agreement, Fox's convictions on counts one and two were a manifest-miscarriage-of-justice and his convictions must be reversed.

**(b)    Failure to Prove Count One's Agreement was to Convey a "Benefit" to the Transgressors.**

To convict Fox of count one, the government was required to show that: (1) Fox had an agreement to kidnap, abduct, seize, or confine another person for ransom, reward, or other benefit, involving travel in or the use

of an instrumentality of interstate commerce; (2) Fox knowingly and voluntarily joined the conspiracy; and (3) a member of the conspiracy performed an overt act. *United States v. Small*, 988 F.3d 241, 252 (6th Cir. 2021).

There were many purposes espoused motivating the group to take action against Governor Whitmer and these purposes evolved over time. However, Ty Garbin, one of the government's cooperators, told the jury at both trials that the plan to which he agreed involved placing Governor Whitmer on a boat in Lake Michigan, floating the boat to the middle of the lake, and dropping the engine. The purpose of doing this was to "cause massive inconvenience to the Governor." (R. #824, Trial Transcript Vol IX, PAGE ID #12,506) and (R. #843, Trial Transcript Vol. VII, PAGE ID #15,646).

This purpose was neither for "ransom" nor "reward," within the meaning of the kidnapping statute. Most importantly, it also did not satisfy the "otherwise" purpose found in the statute, as it's come to be understood.

In 1934, the federal kidnapping statute was amended by adding the "otherwise" purpose to the "reward and ransom" purposes found in the

statute enacted two years earlier. *United States v. Kerns*, 9 F.4th 342, 352 (6th Cir. 2021) (J. Readler, concurring). In *Gooch v. United States*, 297 U.S. 124 (1936), the Supreme Court broadly interpreted the amended statute to punish any act of kidnapping, so long as it was "done with the expectation of benefit to the transgressor." *Id*. at 128.

Acting in a manner to remove Governor Whitmer from her vacation cottage on Birch Lake, setting her adrift in a boat in the middle of Lake Michigan, and dropping the engine was to be done to cause her "massive inconvenience." This purpose does not amount to a "benefit" enjoyed by Governor Whitmer's transgressors.

Because the record is devoid of any evidence alleging that the final plan involving the removal of Governor Whitmer was done with the expectation of benefit to the transgressors, Fox's conviction on count one was a manifest-miscarriage-of-justice and must be reversed.

**(c)    Failure to Prove Lack of "Consent" on Count One.**

An essential element in every kidnapping case is the victim's lack of consent. *United States v. Soto*, 794 F.3d 635, 660 (6th Cir. 2015). Stated another way, in a kidnapping case, to show that the defendant acted "unlawfully," the prosecution "must prove that the victim did not consent

to come along." *United States v. Safehouse*, 985 F.3d 225, 227 (3rd Cir. 2021). Consistent with this jurisprudence, Fox's jury was instructed that "[t]he crime of federal kidnapping is seeing, confining, abducting or carrying away a person without that person's consent for ransom, reward or otherwise where a kidnapper uses a means of interstate commerce to facilitate the crime or either a kidnapper or victim crosses state lines." (R. #845, Trial Transcript, Vol. IX, PAGE ID #16,164).

Governor Whitmer didn't testify at Fox's trial and provided no affirmative evidence that she didn't consent to the plan. In fact, the day after the arrests, Governor Whitmer told the media she knew all about the FBI's operation and received regular updates for months. T. Barrabi, *Michigan Gov. Whitmer was aware of kidnapping plot, state AG says*, FOX NEWS (Oct. 9, 2020); E. Lawler, *Whitmer Knew of Kidnapping Plot for Weeks, She Tells CNN*, MLIVE (Oct. 9, 2020). This indicated she knew of the plan and casually went along with it knowing the FBI had penetrated the militia groups. In its closing argument, the government didn't even mention the consent element.

Because the government failed to elicit any evidence from Governor Whitmer on the consent element, it failed to prove her lack of consent.

Because the record is devoid of evidence pointing to guilt on this issue, the "manifest-miscarriage-of-justice standard" requires reversal of Fox's conviction on count one.

## IV. FOX WAS DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE WHEN THE DISTRICT COURT RULED THE INFORMANTS' COMMUNICATIONS TO THEIR HANDLERS WERE NOT PARTY-OPPONENT ADMISSIONS UNDER FED. R. EVID. 801(d)(2)(D).

**Standard of Review:** This Court reviews a district court's evidentiary ruling for abuse of discretion. *United States v. Thompson*, 501 Fed. App'x 347, 363 (6th Cir. 2012). A court abuses its discretion when this Court is "left with a definite and firm conviction that the trial court has committed a clear error of judgment. *Id.*

Critical to Fox's entrapment defense was the need to show his jury the complete communications between the informants and their handlers. Many of these messages goaded the informants into action, critiqued their performance, and offered suggestions to move Fox beyond rhetoric into prosecutable actions. Equally important were the informants' responses to their handlers' statements.

The district court concluded the agents' statements made in the scope of their duties were admissible as party-opponent admissions, under Rule 801(d)(2)(D). These statements were admissible if the defense showed their relevancy.

61

The district court took a different approach to Fox's request to admit the informants' statements. Those statements that were not admitted for the truth of the matter asserted were inadmissible hearsay. Those admitted for their truth would only be admitted if the informants regurgitated the words of their handlers and if the informants testified. This was an abuse of discretion that infringed on Fox's right to present a defense.

The admission of the informants' statements was straightforward given this Circuit's holding announced in *United States v. Branham*, 97 F.3d 835 (6th Cir. 1996). The district court recognized it was bound by this circuit authority but ignored it. (R. 439, Order, PAGE ID #3010).

Like Fox's case, *Branham* was an entrapment case. In *Branham*, this Court announced that "the federal government is a party-opponent of the defendant in a criminal case." *Id.* at 851. This holding made the informants' statements admissible under Rule 801(d)(2)(D). Recently, a court observed the Sixth Circuit stands alone in treating informants' statements as admissions of a party-opponent. *United States v. Rodriguez-Landa*, 2019 WL 1755518 at *4 (C.D. Cal. Apr. 19, 2019).

Despite the district court's misgivings about *Branham*, that decision was, and still is, the law of this Circuit.

Instead of applying the *Branham* holding, the district court expressed skepticism about the decision's reasoning and instead relied on jurisprudence outside of the Sixth Circuit. The district court ruled that "that except for a narrow category of statements where the CHSs acted as a mere conduit for the words of the government agents, the statements from the CHSs are inadmissible hearsay. Such statements come in, if at all, only when the declarant is testifying in Court." (R. 439, Order, PAGE ID #3011).

This conclusion was at odds with *Branham* which teaches the government's informants were agents of the government for all purposes relevant to Rule 801(d)(2)(D). The evidence showed the informants used in the Whitmer investigation were under the FBI's close direction and supervision, were required to abide by FBI rules and admonishments; and needed FBI approval to break the law in the course of their duties.

The application of *Branham* as well as Rule 801(d)(2)(D) counsel that the informants' statements were admissible against the government because they were all agents of the government at the time the statements

were made and the statements related to matters within the scope of their duties in the investigation. The district court's erroneous application of Rule 801(d)(2)(D) deprived Fox of his right to present his defense and shielded the jury from the informants' conversations showing he was induced to act. This pretrial ruling was an abuse of discretion and deprived Fox of his right to present a defense.

## CONCLUSION

The district court abused its discretion by failing to afford Fox a "constitutionally meaningful" *Remmer* hearing and curtailing his cross examination of one of the government's star witnesses. Additionally, Fox suffered a manifest-miscarriage-of-justice when he was convicted and the record is devoid of evidence to show an agreement was formed, Governor Whitmer's transgressors would realize a benefit from their kidnapping plan, and that she didn't consent to the plan. Finally, the district court abused its discretion by not admitting the informants' statements to their handlers as party-opponent admissions under Rule 801(d)(2)(D).

Respectfully submitted,

/s/ Steven S. Nolder

_____

Steven S. Nolder (0037795)
65 East State Street, Suite 200
Columbus, Ohio 43215
(614) 221-9790
snolder9@gmail.com
Attorney for Adam Fox

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B). The relevant portions of the foregoing brief contain 12,906 words in Century Schoolbook (14-point) type. The word processing software used to prepare this brief was Microsoft Office Word 2010.

/s/ Steven S. Nolder
_____
Steven S. Nolder (0037795)
Attorney for Adam Fox

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Sixth Circuit using the CM/ECF system, to AUSA Nils R. Kessler.

/s/ Steven S. Nolder
_____
Steven S. Nolder (0037795)
Attorney for Adam Fox

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

In accordance with Sixth Cir. R. 30, Appellant hereby designates as "Relevant District Court Documents" the following documents filed in the district court and available via that court's electronic CM/ECF system:

### DOCUMENTS

| Dist. Court Docket # | Id# | Description of Document |
|---|---|---|
| 172 | 961-76 | Superseding Indictment |
| 383 | 2554-2620 | Defendant's 801(d)(2)(D) Brief |
| 439 | 2996-3022 | Order |
| 666 | 8384-8506 | Defendant's 801(d)(2)(D) Brief |
| 711 | 8979-89 | Restricted Access Order |
| N/A | N/A | Jury Verdict (8/23/22) |
| 786 | 10,351-400 | Sealed Amended PSR |
| 801 | 10,634-642 | Judgment |
| 806 | 10,661 | Notice of Appeal |

### TRANSCRIPTS AVAILABLE ON OPEN DOCKET

| | | |
|---|---|---|
| 696 | 8710-67 | Transcript— Final Pretrial, 7/26/22 |
| 824 | 12,405-646 | Transcript Vol IX—Jury Trial 3/24/22 |

| | | |
|---|---|---|
| 828 | 13,357-565 | Transcript Vol. XIII—Jury Trial, 3/30/22 |
| 830 | 13,794-14,016 | Transcript Vol. XV—Jury Trial, 4/1/22 |
| 838 | 14,405-599 | Transcript Vol. II— Jury Trial, 8/10/22 |
| 839 | 14,604-813 | Transcript Vol. III— Jury Trial, 8/11/22 |
| 840 | 14,817-15,022 | Transcript Vol. IV— Jury Trial, 8/12/22 |
| 841 | 15,026-265 | Transcript Vol. V— Jury Trial, 8/15/22 |
| 842 | 15,273-543 | Transcript Vol. VI— Jury Trial, 8/16/22 |
| 843 | 15,548-820 | Transcript Vol. VII— Jury Trial, 8/17/22 |
| 844 | 15,826-16,060 | Transcript Vol. VIII—Jury Trial, 8/18/22 |
| 845 | 16,066-16,182 | Transcript Vol. IX—Jury Trial, 8/19/22 |
| 846 | 16,187-286 | Transcript Vol. X—Jury Trial, 8/22/22 |
| 847 | 16,289-302 | Transcript Vol. XI—Verdict, 8/23/22 |
| 851 | 16,345-387 | Transcript of Sentencing Hrg., 12/27/22 |

## SEALED TRANSCRIPTS

848                16,305-311              Transcript of In-Chambers
                                          Conference 8/11/22

849                16,313-319              Transcript of In-Chambers
                                          Conference 8/12/22

856                16542-553               Transcript of In-Chambers
                                          Conference 8/11/22